JOSEPH MOSS *et al.*, Plaintiffs-Appellees, v. ILDYKO ELOFSSON, Defendant-Appellant.

First District (6th Division) No. 1—88—1958

Opinion filed February 2, 1990.

William J. Harte, Ltd., and Wayne & LeVine, both of Chicago (William J. Harte, Sylvia A. Sotiras, and Edward LeVine, of counsel), for appellant.

Sanford Kahn, Ltd., of Chicago (Richard W. Christoff, of counsel), for appellees.

JUSTICE EGAN delivered the opinion of the court:

The defendant, Ildyko Elofsson, appeals from an order entered in a forcible entry and detainer action declaring a forfeiture in her lease and ordering her to surrender possession to the plaintiffs.

On July 29, 1987, the named plaintiff, "2450 Lake View Trust," initiated a forcible entry and detainer action against the defendant for possession of her apartment, which is located in a cooperative building at 2450 North Lake View in Chicago. On March 29, 1988, the court granted the plaintiff's oral motion to amend the complaint by substi-

tuting plaintiffs, Joseph Moss, Michael Keiser, Gustave A. Bermudez and Lawrence Levy, as trustees of a 1922 trust indenture for the plaintiff "2450 Lake View Trust."

The complaint sought possession of the defendant's apartment after a fire occurred in the apartment. The trustees claimed that the defendant had allegedly breached the lease by failing to provide the trustees access following the fire. The complaint further claimed that the defendant failed to remedy her breach within 30 days after receiving a notice of termination of tenancy.

After a bench trial, the judge entered judgment in favor of the plaintiffs for possession of the defendant's unit.

The defendant has advanced three grounds for reversal:

1. 2450 Lake View Trust was not a legal entity with capacity to sue, and the complaint was improperly amended to substitute the trustees as plaintiffs;

2. The notice of termination served on the defendant was legally defective on its face; and

3. The evidence failed to establish a breach of the lease on the defendant's part.

Since we have determined that the record supports the defendant's argument on the third ground advanced, we need not address the first two, although we will discuss the notice of termination and what was done after the defendant received it.

2450 Lake View Avenue is a residential cooperative apartment building consisting of 13 floors and 11 cooperative apartment units. A trust indenture, dated July 1, 1922, governs the ownership of the building and the apartment units within it.

Although the residents jointly "own" the building, the terms of the trust indenture provide that four trustees manage the trust and actually hold legal and equitable title to the building. Non-trustee residents own certificates of interest, or shares, which give them a beneficial interest in the building and its proceeds. As in 1922, the trustees and the beneficiaries occupy the building's eleven cooperative apartment units.

The trust indenture authorizes and directs the four trustees to maintain the property, keep the books and records, pay the bills, hire and fire employees and generally run the building. They operate essentially as a board of directors. The trustees employ the management company of Wolin-Levin, Inc., to manage the building's day-to-day affairs; Robert Levin supervises the building for Wolin & Levin. The trustees also employ seven other persons, including Philip Boboc (Boboc), the resident engineer who lives on the first floor, Charles

Duffy (Duffy), and Mike Dorgan (Dorgan), doormen and elevator operators.

In accordance with their explicit power to execute leases, the original trustees executed the initial lease for the ninth floor of the building on May 1, 1924. In 1980 this lease was duly assigned to Mrs. Elofsson, a native of Hungary. Consequently, she is a residential unit owner of the ninth floor.

Elofsson's apartment is extremely valuable. It was suggested in oral argument that the property is worth at least $1 million. Of the 11 cooperative units (excluding the first-floor unit occupied by the building engineer), all but two units occupy an entire floor. The nine single-floor units are located on floors 4 through 12 and measure approximately 8,300 square feet each. The two remaining units are split-levels and are located on floors 2 and 3; they measure approximately 4,300 square feet each. The plaintiffs Moss and Bermudez occupy the smaller split-level units. Elofsson occupied the larger single unit on the ninth floor with her husband, Masud Mazhar; her son, Christian Elofsson; her baby-sitter/housekeeper, Helena, and at various times, her stepson Jamal. The lease obligated Elofsson to "allow the lessors at reasonable hours every access" to the premises.

The four trustees are the plaintiffs, Joseph Moss, Michael Keiser, Lawrence Levy and Dr. Gustave Bermudez. Joseph Moss, a non-practicing lawyer, is experienced in real estate. He had lived with his family and a maid on the third floor of the building for five years. Three years before the trial he inspected Elofsson's apartment with a sales agent; he was interested in purchasing the unit. Because of his real estate experience, the trustees entrusted Moss with supervising the management company and with generally taking care of things concerning the building. Moss would consult with the other trustees when he thought it necessary to do so.

Michael Keiser co-owned Recycled Paper Products, a greeting card publishing company located in Chicago. He had lived on the top floor of the building for approximately eight years and had been a trustee for several years.

Lawrence Levy was chairman of the Levy Organization, which included real estate, restaurant and newsstand businesses. He had lived on the eighth floor of the building for 10 years and had been a trustee for two years.

Dr. Gustave Bermudez was a medical doctor. He had lived with his wife on the third floor of the building for 16 years and had been a trustee since 1975.

A fire occurred in Elofsson's apartment at approximately 9 a.m. on April 30, 1987. The fire originated in a sauna room which was located off the kitchen and which had been a part of the apartment since Elofsson moved into it. Her housekeeper, Helena, had placed a towel over an electrical heater in the sauna, and the towel ignited. Elofsson ran to get the fire extinguisher, then called for the elevator and telephoned the fire department. Helena, the housekeeper, Duffy and Frank, another elevator operator, and Boboc, the maintenance engineer, attempted to help Elofsson. Boboc testified that he could not pinpoint the location of the fire, but he saw flames coming from the wood. He attempted to use the fire extinguisher for only two or three seconds before he had to get out of the sauna. He could not "handle himself" because too much smoke got into his eyes. He "fell almost down to the floor." He felt in a "bad situation" and went to the window to breathe. The fire department came within minutes.

The fire did not spread beyond the sauna. Both Moss and Levin were notified of the fire at approximately 9:15 a.m.; they immediately proceeded to the building. The fire department had already left. When Levin entered the building's lobby, he smelled smoke, but it was not apparent to him that there had been much smoke damage. Neither Moss nor Levin was able to see any fire damage other than smoke. There was no evidence of any structural damage to the building or to any other apartment in the building.

When Moss got to the building he could see smoke in the lobby, and Duffy informed him that the smoke came from the Elofsson apartment. Duffy, Moss and Levin went to the apartment.

When the three men exited the elevator on the ninth floor, they found the door from the elevator lobby to Elofsson's apartment half-open. Duffy called out to Elofsson and announced their arrival. Elofsson informed them that she was not clothed and requested that they wait until she dressed. Duffy waited by the elevator, and Moss and Levin waited to enter further into the apartment. They waited between 5 and 10 minutes. Elofsson went to her bedroom, washed her hands and face, put on a robe and greeted them. Moss told her that he and Levin wanted to inspect the damage from the fire.

Moss observed that Elofsson was "properly agitated," "a little nervous, a little anxious, angry." Elofsson told the men to follow her; she then walked Moss and Levin back towards the kitchen while Duffy stayed at the elevator door.

Moss testified that, as the three approached the kitchen, "Mrs.

Elofsson drew her finger across an imaginary line [at the entry to the kitchen] and said, 'That's as far as you go, no more.' " Moss did not wait; he turned without a word and left without seeing any damage. Although Moss saw and smelled smoke in the unit, he could not see any damage. A week after the fire, Moss told Boboc that he (Boboc) was going to be a witness. Moss "thought" that he had instructed Boboc to inspect the apartment the day after the fire.

Levin, on the other hand, testified that Elofsson did not give them entry to her apartment beyond the entrance foyer. He could not recall being in the kitchen; he only remembered seeing the foyer of the unit. He believed that after being asked by Elofsson to wait a few minutes, she then asked them to leave. He did not believe that Moss proceeded any further into the apartment than he did. He did not recall walking through the apartment. He was in the apartment for "maybe several minutes." He also testified that he left the apartment without seeing any damage from the fire. Moss, however, specifically testified that Levin walked alongside him into the apartment.

Elofsson testified that, as she walked into the kitchen, she told her housekeeper, Helena, to put a rug down because the area was extremely dirty and messy from the fire. (The plaintiffs did not dispute the condition of the floor. However, neither Moss nor Levin remembered Elofsson saying anything about wanting to clean up the area.) She also testified that Moss responded, "We haven't got the whole day to wait." She said, "[If you don't wait,] [t]hen that's how far you go." At that point, Moss threw his keys into the air and said to Levin, "Let's go." Moss and Levin departed immediately without any further words. Elofsson asked them to "Please call [her] attorney and make an appointment to come in if [they wanted] to see the damage." Moss could not recall saying that he did not have the time to wait. Levin testified that Elofsson did tell them to call her attorney.

Both Moss and Levin admitted that they were in the apartment for only a few minutes. According to Moss only one minute elapsed from the time he walked from the apartment's foyer to the kitchen until the time he left the apartment. He never attempted to return to the apartment after that date.

From April 30, 1987, until the time Duffy served Elofsson with a notice of termination on June 15, 1987, Moss never personally requested that Elofsson permit him into her apartment. He never instructed his managing agent, Wolin-Levin, Inc., to gain permission to enter her apartment. Similarly, Levin never personally demanded to see Elofsson's unit after April 30, and he did not think that any of his agents demanded to do so. Levin was never asked to return to the

unit, and he never did go back.

When Elofsson called for the elevator around noon on the day of the fire, Duffy asked her how bad the fire damage was. She invited him in, and they walked to the sauna together. He looked at the sauna and expressed his regrets to her. She testified that she told Duffy, "[I]f anybody else would like to see it, just bring the people up [whether] I am home or not." Duffy was called in rebuttal and denied that either Elofsson or her husband ever told him that Moss or any of the trustees could inspect the apartment. (His denial does not specifically rebut Elofsson's testimony.) Duffy admitted that he was in the apartment after the fire; but he said he never personally saw the damage to the sauna. He did not explain why he was in the apartment after the fire.

Elofsson's 14-year-old son, Christian, returned from school at approximately 4 p.m. on the day of the fire. Dorgan, another doorman and elevator operator, met him in the lobby and told him about the fire. Dorgan took Christian up in the elevator and asked him to ask his mother whether he could see the fire damage. Dorgan was invited into the apartment, and Elofsson, Christian and Dorgan went into the kitchen and sauna areas. Dorgan looked at the sauna for about "thirty seconds or so," expressed his regrets and then left. Mrs. Elofsson's testimony corroborated that of her son. Dorgan was not called to rebut the testimony of Christian Elofsson or that of his mother.

Elofsson left the country the first weekend of May and returned June 8. She received the notice of termination on June 15. When she received the notice of termination she called her attorney, Edward LeVine, and read him the notice, which informed her as follows:

"YOU HAVE defaulted in the terms of your Proprietary Lease for the above accommodations [2450 North Lake View, Unit 9, Chicago] as follows:

YOU HAVE failed to allow the Lessors reasonable access to the aforesaid premises in violation of Article First, Paragraph 5 of the Proprietary Lease.

YOU ARE FURTHER NOTIFIED that as a result of the aforesaid defaults, your Proprietary Lease and your Right to Occupy said premises thereunder, will expire and terminate within thirty (30) days of the date of service of this notice.

UNLESS you promptly comply with the above, suit will be instituted for possession together with the costs of such proceeding."

On LeVine's advice, Elofsson tried to contact Moss. She had to ask Dorgan for Moss' telephone number. She telephoned Moss some-

time between June 15 and July 5. She identified herself to a woman who answered and asked if she could leave a message for Mr. Moss. She telephoned a second time a week later and asked a woman who answered if she could speak to Mr. Moss. Moss did not come to the telephone, and Elofsson left a message for him. She was not sure if it was the same woman with whom she had previously spoken. Neither Moss nor any of the other trustees ever asked to see her apartment. She continued to pay her rent to Levin; she delivered the rent to him a couple of times when she was downtown. Moss testified that no one told him that Mrs. Elofsson had called.

Gloria Odens, a secretary employed by the defendant's attorney, testified that she telephoned Mr. Levin on the instructions of her employer. Because Mr. Levin was not in his office she left a message with the girl at his office that she was "calling from Wayne and LeVine on behalf of Mrs. Elofsson and that it would be all right to come up and look at [Elofsson's] apartment at 2450 Lake View at their convenience." The judge later struck all of Odens' testimony on the ground that it was not proper rebuttal. We believe this ruling was an abuse of discretion, but the defendant makes no issue of the ruling and the judge later accepted the testimony as though it was in the record. Levin admitted that he spoke to LeVine several times between the date of the fire and July 15. He did not relate the substance of any of the conversations. He also recalled speaking with someone from LeVine's office.

At the close of the evidence the judge made an analysis of the evidence and what we construe to be findings of fact. He said that he had a very difficult time deciding the case. If he ruled for the plaintiffs, the defendant was in a bad position, first, because she would be forced to sell under an adverse ruling; second, because the buyers would eventually learn of the adverse ruling. He recognized the animosity between the people involved and that at least one trustee "wants to kick her out. If he could kick her out tonight, he would." (There was some evidence of previous disputes between Elofsson and at least one other tenant.) He said that any prospective buyer would find out and that she would be "forced to sell and they [would] squeeze her on the money *** so she [would be] put in a very adverse position."

The judge acknowledged that "it was not a reasonable time for them to inspect while [Mrs. Elofsson] was standing behind the door nude, so she told them to wait until she went and got dressed." He said that after she got dressed, "She let them into the apartment. She led them, so I find it was a reasonable time for them to inspect.

And she acknowledged their right." However, they never determined the extent of the fire on that day within that short period of time. *"Moss was looking for something to get her out.* They didn't like her, although there's not much evidence about that *** but the trustees wanted her out. Maybe it was just Moss, but he was a trustee and maybe he was looking for things." (Emphasis added.)

He further acknowledged that Elofsson was in a state of anxiety and was not thinking in terms of the lease. He also recognized that "Moss grabbed onto it right away because he is in the real estate business and he maybe knew that that was a default" so Moss said, "okay and tossed his keys up and said 'good-bye.' He was gone in a minute. 'You don't want to let me in, good-bye,' and [he] walked away and walked out, and he never tried to go back again. Maybe he knew legally he had her on a breach of the lease and she knew." The judge again recognized that there were animosities between the people and concluded, "so [Elofsson] had to be above reproach like Caesar's wife in regard to her legal obligations."

He believed that Elofsson went to Europe after the fire but ruled that because she had been the "last actor," because she had stopped the inspection, "the volley-ball or the ball swung to her *** [T]he ball shifted to her to see to it that the apartment was accessible and to be inspected by proper authority." He also indicated that he believed that Elofsson probably told Moss to contact her attorney to make an appointment to inspect her apartment, but *he ruled that Moss was not obligated to do that.*

The judge also indicated that he believed that Elofsson attempted to telephone Moss twice, but he held that "she had to do more than that *because Moss never came.* Maybe he never came because he didn't like her or he didn't want to because he felt 'I'm going to wait until this 30 days goes by after June 15th and *we're going to squeeze her,* we're going to sue her.' So she sat by and she made the two calls. That was it." (Emphasis added.)

He believed Elofsson's testimony that the plaintiffs' employees came into the apartment. Specifically, one came in to read the meter which was a short distance from the sauna and that he could "kind of peek over to see what happened." He said, "[T]hat was the inspection right there, but they were not the proper authorities to look, *although they could have been delegated.*" (Emphasis added.) But, he added, "There's no evidence that the trustees delegated them to go and look and see that damage *** *That was her obligation* to prove of going forward [sic]." (We point out that Elofsson's testimony that Dorgan examined the fire damage was unrebutted.)

The judge ruled that Elofsson had violated the lease by not giving the trustees the right to inspect and that "she should have been pushing hard. She could have gone down there and knocked on [Moss'] door and said, 'Now, look, it's six o'clock. I know you're home' or connected with the doorman and said, 'Mr. Moss, I'm not giving you any written notice, but come on in and inspect.' *** [S]he had to do something to overcome the weight of the notice that was pressing her. *** She had to do more." Consequently, the judge found that Elofsson did not "effectively notify or arrange an inspection where common sense or knowledge, maybe legal knowledge, was required." After that summation he ruled that Elofsson had breached her lease by failing to provide access and that the plaintiffs were entitled to possession.

We find it impossible to reconcile the judge's findings of fact and analysis of the evidence with his ultimate conclusion that the plaintiffs had established their right to a forfeiture. We also believe that he misconstrued the duties imposed on the parties by the lease and by the law.

The judge, in effect, held that Moss had taken advantage of the situation that unexpectedly arose which was, in military parlance, a target of opportunity, and that Moss prepared to loose a cannonade. The judge's holding is supported by the evidence. Of particular significance is Boboc's testimony that only one week after the fire, long before any letter of termination was sent, Moss told him that he was going to be a witness. This testimony clearly indicates that Moss had made up his mind at that time to remove Elofsson by court action.

In view of the judge's observation of the obligations of Elofsson to act like "Caesar's wife," it is appropriate to discuss the obligations of Moss. During oral argument the plaintiffs' attorney agreed with the statement made by the defendant's attorney that Moss was a fiduciary to the defendant. But, he added, Moss was also a fiduciary to all the other beneficiaries. The plaintiffs argue that it was Moss' duty to examine the fire damage for the benefit of the other beneficiaries; their safety was in question. As the plaintiff Levy put it, the trustees were concerned about their inability to see the damage because they could not tell if there were "systemic" problems that would affect the other people in the building. He said, "It wasn't the amount of damage that was done, it was the threat to the life safety of everybody else who lived in the building." Levy, who lived in the apartment just below Elofsson's, took no steps to determine whether there was any "systemic" problem nor did he direct anyone else to inspect Elofsson's apartment. If, in fact, the trustees were concerned about any

potential danger to the safety of the other residents, their complete inertia after the confrontation between Elofsson and Moss reflects a disregard for their fiduciary obligations to the other residents. Similarly, Moss' perfunctory request to examine the premises and his precipitous departure do not speak well of his attitude toward the other residents. One concerned with their safety would have remonstrated with Elofsson or cajoled or begged her, or threatened her with the legal consequences. It is more reasonable that the trustees knew that there was no compelling reason to inspect the premises.

■■ ■ With respect to Moss' obligation to Elofsson, as a trustee he was a fiduciary to Elofsson as a matter of law. (*Carroll v. Caldwell* (1957), 12 Ill. 2d 487, 495, 147 N.E.2d 69, 73.) Regardless of the nature of the trust, the obligation of a trustee to a beneficiary is the same: The trustee is charged with equitable duties toward the beneficiary. It is the trustee's duty to serve the interest of the beneficiary with complete loyalty, excluding all self-interest. (*Home Federal Savings & Loan Association v. Zarkin* (1982), 89 Ill. 2d 232, 432 N.E.2d 841.) It is our judgment that the judge's findings, which, we repeat, are supported by the record, are not findings that Moss fulfilled his fiduciary obligation to Elofsson.

■■ The fiduciary obligation of Moss to Elofsson, however, should not becloud the primary issue, which is whether Elofsson breached the lease by refusing access at a reasonable hour. In our judgment, the record fails, as a matter of law, to show a willful breach of the agreement to permit access at reasonable hours. The term "reasonable hours" is not restricted to a reasonable time of day. Common sense dictates that it be construed to mean under "reasonable circumstances" as well. The request itself should be made in a reasonable manner. The judge acknowledged that Elofsson was in a state of anxiety and was not thinking in terms of the lease. Her mental state was understandable. We construe the judge's remarks to mean that he believed Elofsson's testimony as to what occurred between her and Moss and Levin. Her testimony does not disclose a refusal of access under the circumstances that would support a forfeiture.

■■ We also believe that, as a matter of law, Elofsson made it clear, before the notice of termination had been sent, that the premises were available for inspection. We further believe that, as a matter of law, the premises were inspected pursuant to the lease.

Elofsson's son, Christian, testified that he saw Boboc looking around in the sauna room with a flashlight about three or four days after the fire. Boboc and Duffy both admitted that they were in the apartment after the fire but could not remember why they went

there. Christian Elofsson also testified that Dorgan was permitted to examine the fire damage at Dorgan's request. Elofsson testified to the same effect. Dorgan never refuted that testimony. The judge's remarks can be construed only as an acceptance of the testimony of Christian and Elofsson. The judge held, however, that any inspection by Boboc, Duffy or Dorgan was legally insufficient because there was no proof that the trustees had delegated authority to inspect to any of those employees. We do not understand the basis of the judge's holding. We note that Article Second, paragraph 4, of the lease provides that the lessee shall "at all reasonable times allow the *representatives* of the lessors to enter and inspect the demised premises for the purpose of determining the necessity and character of any such repairs or other work." (Emphasis added.) It does not make sense that representatives could examine the premises on certain occasions but only trustees could on other occasions. Any doubts in the language of the lease will be construed in favor of the lessee. (*American National Bank & Trust Co. v. Lembessis* (1969), 116 Ill. App. 2d 5, 253 N.E.2d 126.) Significantly, the notice of termination was signed by an agent of the trustees. The trustees did not take the position that so important a step could not be delegated. Finally, we refer again to Moss' testimony that he thought he instructed Boboc to inspect the apartment the day after the fire. In sum, the overwhelming evidence establishes that proper representatives of the plaintiff did inspect the premises.

■ Even assuming for the sake of argument that the evidence established that the confrontation between Elofsson and Moss on the day of the fire constituted a breach on her part, and that the premises were not inspected by proper persons, we believe the judge also erred in concluding that the defendant was obligated to do more than she did after she received the notice of termination. There is nothing in the lease which spells out what steps a lessee must take to notify the lessor of attempts to cure any breach. Again, any ambiguity in the lease will be resolved in favor of the lessee. It would serve no purpose to prolong this decision by repeating the evidence which the judge apparently believed, and properly so. The record shows the defendant's good-faith efforts to disabuse the trustees of any notion that she was denying them access to her apartment. Suffice it to say that her efforts were reasonable under the circumstances.

■ A party seeking to enforce a forfeiture provision bears the burden of proving that the right to a forfeiture clearly and unequivocally exists and that the exercise of forfeiture does not result in injustice. (*Bocchetta v. McCourt* (1983), 115 Ill. App. 3d 297, 450 N.E.2d

907.) In addition to the failure of the plaintiffs to meet their burden of proof that there was a breach, entry of a forfeiture here will result in gross injustice.

For these reasons, the judgment of the circuit court is reversed.

Reversed.

LaPORTA, P.J., and CERDA, J., concur.